COURT OF APPEALS OF VIRGINIA

Present: Judges Friedman, Frucci and Senior Judge Humphreys
Argued at Fredericksburg, Virginia

PUBLISHED

WEI ZENG, ET AL.

v.      Record No. 0523-23-4

CHARLES WANG

OPINION BY
JUDGE FRANK K. FRIEDMAN
OCTOBER 8, 2024

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge

Mike Margolis (Victoria Ortega; Blank Rome, LLP, on briefs), for
appellants.

James T. Bacon (George R.A. Doumar; David R. Mahdavi; Raj H.
Patel; Mahdavi, Bacon, Halfhill & Young, PLLC, on brief), for
appellee.


Wei Zeng, Dong Yang, Ying Chen, and Rui Wang (collectively, appellants) appeal the trial

court's ruling that their fraud and constructive fraud claims were barred by the statute of limitations.

Appellants contend that the trial court's judgment was plainly wrong and based on erroneous legal

standards. For the following reasons, we affirm.

BACKGROUND[1]

In July 2019, appellants sued Charles Wang, seeking over $2.5 million in damages for fraud

and constructive fraud. The complaint alleged that appellants were Chinese nationals who each

invested $500,000, plus $60,000 in associated fees, into the Greentech Automotive Project (GTA

project), which was "owned and controlled" by Wang. The GTA project is generally composed of

---

[1] If evidence is presented at a plea in bar hearing, then the trial court's factual findings are
given the same weight as jury findings and will not be disturbed on appeal unless plainly wrong
or without evidentiary support. *See Cornell v. Benedict*, 301 Va. 342, 349 (2022).

closely related corporate entities organized to design, manufacture, and sell electric vehicles using the brand "MyCar." Appellants invested in the GTA project under the federal Employment-Based Immigration Fifth Preference Program (EB-5 program), which qualifies investors who create at least ten jobs in the United States for a permanent green card.

Appellants alleged that they invested after reasonably relying on "false representations of material fact" in marketing materials, including emails, brochures, newsletters, and a PowerPoint presentation, that Wang "prepared, drafted and/or approved." Appellants alleged that they were "inexperienced" investors and the marketing materials were designed to persuade them that the investment was "much less risky than in fact it was." Appellants allegedly discovered the fraud at an August 2017 meeting in Rugao, China. The GTA project entities "filed for bankruptcy" in February 2018, and appellants "lost their entire investments."

At a plea in bar hearing, in which evidence was presented, Wang argued that appellants could not reasonably rely on the marketing materials and that, in any event, their suit was barred by the two-year statute of limitations. Although denying that he made any of the allegedly false statements at issue, Wang maintained that appellants signed "offering documents" in 2012 and 2013, including a private placement memorandum (PPM), disclosing that the investments were risky and that the information in the marketing materials was not accurate. Wang also argued that appellants should have known that the marketing materials were not accurate given a "blitz of critical media reports" about the GTA project beginning in 2012.

Wang, a corporate securities lawyer, testified at the plea in bar hearing that he was teaching at the Peking University Law School in Beijing in 2007 when he and an "old friend," former governor Terence McAuliffe, discussed starting an "EV" car business, which became the GTA project. McAuliffe provided "corporate direction," and Wang managed "everyday operation." In 2009, Anthony Rodham began managing the company's fundraising through a corporate entity,

Gulf Coast Funds, LLC.  For "seed money," Gulf Coast Funds turned to the federal government's

EB-5 program.  The United States Citizenship and Immigration Services (USCIS) had approved

Gulf Coast Funds to serve as the project's "regional center," which qualified the project for the

EB-5 program.

Wang testified that "the princip[al] requirement" of the EB-5 program is that an investor's

money must go to an "at risk investment" such as a startup or failing business; otherwise, the

investor would not qualify for a visa.  Accordingly, Wang required all investors, including

appellants, to read and sign a PPM and subscription agreement to disclose the risks and ensure they

understood the at-risk nature of the project.  Wang insisted, however, that he did not have any

personal communication with appellants from 2011 through 2015.  Instead, Gulf Coast Funds

"manag[e]d the EB5 part of the project," and another related company, Capital Wealth Holdings,

managed the investors' administrative fees.  Capital Wealth Holdings distributed "marketing

materials" to Chinese immigration agents and firms such as Well Trend and Sinolink Global

Consultants (Sinolink), which used those materials to attract additional investors.[2]

I. The project's offering materials lay out clear risks of the project.

The GTA project subscription agreement recited that each investor had "received and read a

copy of the" PPM and other "Offering Materials" and that the investor had "relied on nothing other

than the Offering Materials in deciding whether to make an investment."  The PPM informed

investors that the GTA project had no "prior operating history" and that the entire "idea" was

"forward-looking."  The project was "highly speculative and entail[ed] a high degree of risk,

including the risk of loss of [the] entire investment."  The PPM warned that an investment was

---

[2] Wang testified that he "controlled Capital Wealth Holdings," "owned Gulf Coast Funds . . . without control," and was a "majority shareholder" of Greentech Automotive.  He asserted that the immigration firms were independent contractors.

suitable "only for sophisticated investors," and each investor should consult an attorney before investing.

The PPM further cautioned that there was "no assurance that" the investors' related immigration applications "will be approved." In fact, the USCIS had denied ten prior GTA project investors' "I-526 applications," though those denials were related to issues with the investors, not the project. Moreover, although each investor needed to create 10 full-time jobs within the United States to gain USCIS's approval, when appellants signed the PPM, the GTA project had a total of only "71 full-time employees," and its future job creation could be substantially less than its target. The GTA project hoped to rely on an employment "multiplier" to determine direct and indirect jobs created, but the PPM advised investors that USCIS may not approve use of such a multiplier.

In addition, the PPM advised appellants that, other than the sale of 59 cars "by acquired company EuAuto," the GTA project had "generated no revenue from [its] operations and remained in the product development stage." The project hoped to produce 5,000 cars in 2012, but that plan was subject to "significant risks." Indeed, the project had "limited experience" developing a production model or manufacturing an automobile, "no experience" in "high volume manufacturing," and did not know whether it would be able "to successfully mass market" its vehicles. In fact, the project had incurred "net losses" through 2011 and anticipated its losses "to increase significantly" as it designed the car, developed and equipped the production facility, established inventory, expanded its distribution network, established "repair capabilities," increased marketing, and increased "administrative functions." The project "assum[ed]" that it would "be able to secure the funding necessary" to build a production facility and that the purchased equipment could produce the intended vehicles.

Next, the PPM advised that the GTA project sought $50 million in funding, and as of January 2012, 99 investors had contributed $49.5 million. In total, those investments were secured

by a deed of trust on 80 acres of land, including certain machinery, equipment, and fixtures.  The PPM warned, however, that the deed of trust lacked certain "substantial covenants" that protected lenders and the investments may not be fully secured by the pledged collateral.  The PPM reported that the GTA project might "enter into a joint venture based in China to manufacture and sell" vehicles.  Such a "Joint Venture," however, was not guaranteed and had not been finalized.

Wang testified that the GTA project ultimately could not raise any money through sources outside the EB-5 program.  He attributed the struggles to SEC and USCIS investigations that coincided with McAuliffe's decision to run for governor.  These investigations also precipitated many media stories in the United States and China about the GTA project's problems.

II.  Appellants signed the offering documents before investing but did not read them or exercise due diligence as bad news about the investment accumulated.

Each appellant in this case invested in the GTA project in 2012 or 2013, and each acknowledged that they had signed the offering documents before investing.  But appellants claimed that their decisions to invest were based on false marketing materials—even if these marketing materials were flatly contradicted by the offering documents and PPM.  As an example, in February 2011, appellant Chen hired an immigration agent from Sinolink, who provided him information about the project, orally and in writing.  The information included a brochure representing that investors accounted for only 7.8% of the project's "total investment and the remaining amount will be sponsored by the federal government, the state government and the local government."[3]  The brochure stated that the project was "long-term," having attracted 200 investors each year since 2009, which "substantially reduced investment risk."

Chen admitted that he had signed "some legal documents" before investing.  He could not read the documents, however, because they were in English, and the immigration agent identified

---

[3] Wang stipulated that this was a false statement and testified that "substantially all investments came from EB5 investment."

nothing in the documents that contradicted the representations in the brochure. He stated that he would not have invested had he known the offering documents contradicted the marketing materials and that he also would not have invested had he known that he could lose his investment, there was no guarantee, and the investment was "extremely risky."

Between 2013 and 2016, after making the investment, Chen received interest payments on the money he gave the GTA project, consistent with the terms of the offering documents and PPM. Chen thus believed that the GTA project was dealing with him in good faith. Additionally, in October 2014, Gulf Coast Funds sent Chen a "GTA Newsletter" that reported several items of positive news regarding the project's fundraising and investors successfully obtaining green cards. In January 2015, however, Chen learned that immigration applications were taking longer than normal, and he stopped receiving interest payments in 2016. Chen was "unhappy" but "took no action to investigate."

Similarly, appellant Zeng testified during the plea in bar hearing. She invested in the GTA project in 2012 after her immigration agent at Sinolink provided certain information about the project that she relied on. In May 2012, her agent emailed her a PowerPoint presentation about the GTA project and the EB-5 immigration program. The PowerPoint represented that the GTA project was raising money to build a "large-scale production and development base" in Mississippi to produce "new energy-saving, environmentally friendly . . . hybrid vehicles." The technology, design, and prototype of the vehicle was "completed," and the project was "preparing to establish a vehicle production line." And the presentation asserted that a federal government-approved economic analysis report concluded that each direct employment of the project was "equivalent to directly and indirectly employing 11.86 employees," meaning that if the project employs "0.9 employees, it can meet an investment immigration target," resulting in more green cards. It promised investors that their investments were "overcollateralized," as "[t]he land used for

mortgage, factory construction and equipment on the land are used as collateral," and their "value exceeds the total loan amount."[4] It also asserted that the investors account for only 7.8% of the "total investment ratio," the remainder "sponsored by the federal government, state and local governments," and free or low-interest loans.

Additionally, in June 2012, Zeng's agent emailed her a brochure further promoting the GTA project. According to the brochure, the project had produced its first vehicle in November 2011, and had "invested in a joint venture in Ordos, China . . . in August 2011," with the project holding 50% of the joint venture's shares.[5] Mississippi allegedly had provided the project $25 million in cash, land, and various tax deductions. The brochure suggested the project's "production of electric vehicles in 2012 has been completely sold out,"[6] and "multiple guarantees [had] been obtained for GTA's market success." The project was in its "third phase," and "the pass rate of I-526" applications "for EB-5 investors who invested in the project in the first two phases was 100%." Later, the brochure boasted of a "100% project investor approval rate." And the brochure promised that the GTA project would "use 100 acres of land and its plant and equipment as collateral to repay the loan to the EB-5 investors, who ha[d] a first-ranking mortgage on the collateral" and that the total value of the collateral exceeded the loan amount.[7] Finally, the brochure boasted that the GTA project had "the highest employment magnification factor (17.45)" for determining how many jobs

---

[4] Wang conceded that this was a false statement because the loan was not "overcollateralized."

[5] Wang conceded that the GTA project had not invested in a joint venture with an Ordos company.

[6] Wang admitted that this was a "ridiculously" and "laughabl[y] false statement" because there were no cars, and the money was intended to build a production facility, and the GTA project could not sell "a nonexistent production capacity."

[7] Wang testified that this statement was "untrue."

each investment created.[8]  Zeng stated that she was influenced by the PowerPoint and brochure's representations.

Zeng acknowledged that she had signed "some lengthy legal documents" before investing, but they were in English, and she did not understand them "thoroughly."  Her immigration agent confirmed that the documents had a money-back guarantee if her immigration application was not approved, but she did not notice anything in the documents that contradicted the PowerPoint or brochure.  If she had learned that the documents "contradicted the factual statements in the marketing materials," she would not have invested.

After she invested, Zeng received generally good news about the GTA project and heard that prior investors had a 100% success rate in obtaining green cards.  In October 2014, she received an email reporting that orders for the cars "continued to increase."  Zeng also continued to receive interest payments on her investment until January 2016.  When the interest payments stopped, she contacted her immigration agent, who forwarded her a memo containing bad news about the GTA project's finances and ongoing litigation.  She asked for a "refund" of her investment, but the GTA project did not provide it, and she did nothing further to investigate.

III.  The August 2017 investors meeting where appellants claim the fraud first appeared

At an investors meeting in August 2017 in Rugao, China, investors and project personnel discussed the GTA project's financial hardships.  Before that meeting, appellants had not suspected that any of the information in the marketing materials was false, and they had not heard any "rumors about problems with GTA."  They also had not read any news articles reporting on the GTA project's struggles.  They filed their lawsuit in July 2019.

---

[8] Wang was not aware that the USCIS had ever approved such an employment magnification factor.

IV. The plea in bar arguments

After the close of evidence at the plea in bar hearing, Wang argued that appellants' fraud actions accrued when they signed the offering documents because, at that point, they "should have known" that the statements in the marketing materials were false. Those documents, according to Wang, were "big, flashing signs" that put appellants on notice that the marketing materials were false and that they should hire their own attorneys. Wang also argued that media reports and "serious problems with the company" put appellants on "inquiry notice" by 2016, when visas were being denied and interest payments ceased. Yet appellants did not investigate any issues or conduct any "due diligence."

Appellants countered that the formal offering documents did not directly contradict any of the misrepresentations in the marketing materials. Rather, the PPM was "less a disclosure than a riddle," requiring appellants to make "leaps of intuition" to understand that the marketing materials were false. In any event, appellants contended that mere contradictions between the PPM and marketing materials "would not raise an inference that *fraud* had occurred." They also argued that Wang lulled them into a false sense of security in the years following their investment.

V. The trial court's orders and finality concerns

On August 19, 2022, the trial court issued a "Memorandum Opinion and Order" finding facts sufficient to sustain Wang's plea in bar. The trial court found that appellants exercised no diligence before investing and relied entirely on the marketing materials produced by the immigration agents. "[E]ven the simplest of diligence" would have required translating the PPM into "Chinese or procuring advice of counsel or a trusted financial or investment advisor[] to explain . . . the meaning and significance" of the PPM before investing $500,000. The trial court

found that appellants "took no steps to become informed as to the nature of the investment." Nor did they "ask for financials or corroboration" of the marketing materials.

The trial court found that the PPM contained several indications that the marketing materials "were false" and that signing the PPM "triggered a duty of inquiry and precluded [appellants] from relying on the word of brokers who had arranged for the investments to be made." The trial court also found that appellants "confirmed that they received, read, and signed offering documents which stated that the previous statements from the marketing brochures and PowerPoint were false." The court agreed with Wang that "not reading" the PPM did not excuse appellants from bringing their claims within the statute of limitations. Alternatively, the trial court found that, even without the PPM, numerous "media articles" "should have given [appellants] knowledge or put them on notice of the alleged fraud in the marketing materials."

The trial court's opinion and August 19, 2022 order asked Wang's counsel to circulate a future order reflecting the court's decision, and the August order contemplated a further hearing to address objections "before entry of a final order." On September 8, 2022, the court issued a follow up order scheduling a hearing for October 27, 2022, to consider appellants' objections to the court's ruling. This order established a briefing schedule and reiterated that a "final order will not be entered until the Court has an opportunity to consider and comment on those post-hearing briefs."

Appellants filed several objections and a motion for the trial court to reconsider its ruling. First, they contended that the trial court erroneously concluded that they had the burden of proof to show that they could not have discovered the fraud through the exercise of due diligence. Appellants also argued that the court inappropriately focused on whether appellants exercised due diligence in making the investment, which was outside the scope of the plea in bar. In appellants' view, the trial court conflated the issue of reasonable reliance with notice of fraud.

- 10 -

Next, appellants argued that the trial court had failed to identify any PPM assertions that directly contradicted the marketing materials, and erred by finding that the PPM informed appellants that the marketing materials were false. Thus, appellants objected that the documents did not put them on notice of fraud. Finally, appellants also objected that the "media reports" did not contradict the marketing materials, were unknown to appellants, and in any event, were not in the record, so they could not form the basis for the court's judgment.

On October 27, 2022, the trial court entered an order agreeing with appellants that the "news articles" had not been admitted into evidence. Accordingly, the court took the "matter" under advisement for "reconsideration" of its decision. After another hearing, the trial court found that Wang had met his burden of proving that the statute of limitations had expired because the claims accrued when appellants received the PPM. The court noted that the burden then shifted to appellants to demonstrate that they could not have discovered the fraud in the exercise of due diligence and that they had not met that burden. The court entered a final order sustaining the plea in bar on February 22, 2023, which it designated a "Final Order." This appeal follows.

ANALYSIS

I. Wang's motion to dismiss

As a threshold matter, Wang moves this Court to dismiss this appeal on the ground that the trial court did not have jurisdiction to enter the February 22, 2023 order under Rule 1:1(a). He argues that the August 19, 2022 "Memorandum Opinion and Order" was a final order that disposed of "every cause of action" before the court and left nothing to be done save the ministerial execution of judgment. He thus maintains that appellants' notice of appeal challenges the void ab initio February 22, 2023 order, and was untimely as to the August 19, 2022 "final order." *See Super*

- 11 -

*Fresh Food Mkts. of Va. v. Ruffin*, 263 Va. 555, 563-64 (2002) (dismissing an appeal due to late notice of appeal).

"Except as otherwise provided by statute, no appeal will be allowed unless, within 30 days after entry of final judgment or other appealable order or decree, . . . counsel files with the clerk of the trial court a notice of appeal," and provides a copy of the notice to opposing counsel. Rule 5A:6(a); *see also* Code § 8.01-675.3 ("[A] notice of appeal to the Court of Appeals . . . shall be filed within 30 days from the date of any final judgment order, decree, or conviction."). "'To determine the timeliness of a notice of appeal from a final judgment, obviously it is first necessary to determine the date of the action of the trial court that constitutes the final judgment,' which is generally marked by the entry of a final order." *Jefferson v. Commonwealth*, 298 Va. 473, 475 (2020) (quoting *Super Fresh*, 263 Va. at 560). "The question of whether a particular order is a final judgment is a question of law that we review *de novo*." *Carrithers v. Harrah*, 60 Va. App. 69, 73 (2002).

"All final judgments, orders, and decrees, irrespective of terms of court, remain under the control of the trial court and may be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer." Rule 1:1(a).

> [A] judgment, order or decree is final if it disposes of the entire matter before the court, including all claim(s) and all cause(s) of action against all parties, gives all the relief contemplated, and leaves nothing to be done by the court except the ministerial execution of the court's judgment, order or decree.

Rule 1:1(b).

> [W]hen a trial court enters an order . . . in which a judgment is rendered for a party, unless that order expressly provides that the court retains jurisdiction to reconsider the judgment or to address other matters still pending in the action before it, the order renders a final judgment and the twenty-one day time period prescribed by Rule 1:1 begins to run.

*Super Fresh*, 263 Va. at 561.

- 12 -

"The distinction between an order that renders judgment and retains jurisdiction and an order that renders judgment but does not retain jurisdiction" is often language that "expressly indicate[s] that the order was not rendering final judgment." *Id.* at 561-62. For example, the Supreme Court held that a nonsuit order was a final order even though it contained language stating: "[t]his suit shall remain on the docket for the Court to determine issues concerning attorney fees, costs and expenses incurred." *City of Suffolk v. Lummis Gin Co.*, 278 Va. 270, 277 (2009). By contrast, a nonsuit order was not final when it provided, "for purposes of Rule 1:1, this is not a final order, in that this [c]ourt shall retain jurisdiction of this matter to consider any application for attorney's fees and costs and such other relief as may be sought." *Johnson v. Woodard*, 281 Va. 403, 407, 409-10 (2011). In *Johnson*, the Supreme Court emphasized that the nonsuit order expressly stated that it was not a final order under Rule 1:1 and that the court retained jurisdiction. *Id.* at 410. Such language was "sufficient for the court to retain jurisdiction to consider the motions for attorney's fees and costs and sanctions." *Id.*

Here, the August 19, 2022 "Memorandum Opinion and Order" does not expressly invoke the "retained jurisdiction" language used in *Johnson*—but it did state that it would hold a future hearing "before entry of a final order." Moreover, the order did not conclusively sustain the plea in bar as Wang contends. Rather, it found facts sufficient to sustain the plea in bar, stated that the plea "*will be* sustained," and it directed Wang's counsel to "draft and circulate an [o]rder for entry reflecting the decision." *See Kellogg v. Green*, 295 Va. 39, 45 (2018) ("Where further action of the court in the cause is necessary to give completely the relief contemplated by the court, the decree is not final but interlocutory." (quoting *Brooks v. Roanoke Cnty. Sanitation Auth.*, 201 Va. 934, 936 (1960))); *see also* The Chicago Manual of Style § 5.125 (16th ed. 2010) ("The future tense is formed by using *will* with the verb's stem word"; "[i]t refers to an *expected*

- 13 -

*act*" (second emphasis added)).  The trial court also set a hearing for entry of the future order, noting that appellants would then be able to "list such objections as are necessary" at that time.

On September 8, 2022, the trial court held such a hearing and entered an order establishing a briefing schedule for "post-hearing pleadings."  Again, the trial court emphasized its judgment was not yet final, stating, "A final order will not be entered until the Court has an opportunity to consider and comment on those post-hearing briefings."  Under these circumstances, we find that the trial court did not enter a final order under Rule 1:1 on August 19, 2022.  Instead, it made clear that a final order would be issued later and specifically directed counsel to draft a future order reflecting the ruling.  The court indicated in the August 19, 2022 order—and repeatedly thereafter—that no final order had been entered.  *Cf. Super Fresh*, 263 Va. at 561-62 (focusing on language that expressly indicates that "the order is not rendering final judgment").  Under these circumstances, we find that the February 2023 order is the final order in this case and Wang's motion to dismiss this appeal is denied.[9]

II. The statute of limitations defense

"A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery."  *Cornell v. Benedict*, 301 Va. 342, 349 (2022) (quoting *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019)); *see also Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116-17 (2008) ("The purpose of a plea in bar is to 'reduc[e litigation] to a distinct issue of fact which, if proven, creates a bar to the plaintiff's right of recovery.'" (alteration in original)

---

[9] "A final order or decree for the purposes of Rule 1:1 'is one which disposes of the whole subject, gives all the relief contemplated . . . and leaves nothing to be done in the cause save to superintend ministerially the execution of the order.'" *Friedman v. Smith*, 68 Va. App. 529, 538 (2018) (quoting *de Haan v. de Haan*, 54 Va. App. 428, 436-37 (2009)). "Stated differently, an order that 'retains jurisdiction to reconsider the judgment or to address other matters still pending' is ordinarily not a final order." *Id.* (quoting *Super Fresh*, 263 Va. at 561). "Thus, a 'decree which leaves anything in the cause to be done by the court is interlocutory,' rather than final, in nature." *Id.* (quoting *Prizzia v. Prizzia*, 45 Va. App. 280, 285 (2005)).

(quoting *Tomlin v. McKenzie*, 251 Va. 478, 480 (1996))). "The movant bears the burden of proof on such a plea, and if evidence is presented *ore tenus*, the circuit court's factual findings 'are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support.'" *Cornell*, 301 Va. at 349 (quoting *Massenburg*, 298 Va. at 216). "When the plea in bar depends on pure legal questions, including questions of statutory construction, we review the circuit court's holding de novo." *Id.*

The statute of limitations for appellants' fraud and constructive fraud claims is two years. Code § 8.01-243(A); *Schmidt*, 276 Va. at 117. The cause of action accrues "when such fraud . . . is discovered or by the exercise of due diligence reasonably should have been discovered." Code § 8.01-249(1). The so-called "discovery rule serve[s] to soften the hard edges of statutory limitations periods." *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993). Indeed, "the facts which underlie a plaintiff's allegations may only gradually come to light." *Id.* "Commencement of a limitations period need not, however, await the dawn of complete awareness." *Id.*

A defendant asserting the plea in bar to a fraud claim bears the burden of proving that the statute of limitations has expired, including establishing when the cause of action accrued. *Schmidt*, 276 Va. at 117. After the defendant makes such proofs, the burden shifts to the plaintiff "to prove that, despite the exercise of due diligence, he could not have discovered the alleged fraud within the two-year period before he commenced the action." *Id.* "In other words, [a defendant does] not have to show the lack of due diligence." *Id.*; *Hughes v. Foley*, 203 Va. 904, 907 (1962).

In the trial court and on appeal, it is uncontested that appellants did not have actual knowledge of the fraud when they signed the offering documents and invested in 2012 and 2013.

Instead, this case turns on whether they reasonably *should have discovered* the fraud through the exercise of due diligence.

      A.  Appellants did not preserve their argument that the "Offering Documents Cannot Be Considered at All" given the immigration firms' "dual-agency."

To begin, appellants argue that the "Offering Documents," including the subscription agreements and PPM, "cannot be used . . . to show notice of Wang's fraud" because the immigration firms that produced the marketing materials were dual-agents, representing appellants and Wang. Thus, they assert that Wang was "chargeable with the actions and omissions of the immigration agencies" and appellants "were entitled to trust" unconditionally "what the immigration agencies told them." Appellants insist that the immigration agencies "had a duty" to note any discrepancies between the marketing materials and offering documents, and their failure to do so was "concealment of a material fact" and constituted an implied representation that there were no inconsistencies between the documents. Those circumstances, according to appellants, should have estopped Wang from relying on the offering documents to demonstrate "notice of fraud."

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "Rule 5A:18 requires a litigant to make timely and specific objections, so that the trial court has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals.'" *Brown v. Commonwealth*, 279 Va. 210, 217 (2010) (quoting *West v. Commonwealth*, 43 Va. App. 327, 337 (2004)). "Specificity and timeliness undergird the contemporaneous-objection rule [and] animate its highly practical purpose." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would

know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

Appellants did not argue to the trial court that the immigration firms' "dual-agency" estopped Wang from relying on those materials. Nor did they argue that because of the agency relationship, the firms' failure to point out differences between the marketing materials and offering documents constituted an implicit representation that there were no differences. *See Moison v. Commonwealth*, 302 Va. 417, 419 (2023) ("On appeal, though taking the same general position as in the trial court, an appellant may not rely on reasons which could have been but were not raised for the benefit of the lower court." (quoting *W. Alexandria Props., Inc. v. First Va. Mortg. & Real Estate Inv. Tr.*, 221 Va. 134, 138 (1980))). Rather, at trial, the parties presumed that the offering documents were legally relevant and devoted much of their argument to parsing the extent to which they contradicted the marketing materials. Thus, the trial court did not have the opportunity to rule on the argument appellants now raise, so this Court will not consider that argument for the first time on appeal. *Bethea*, 297 Va. at 743 ("Procedural-default principles require that the argument asserted on appeal be the same as the contemporaneous argument at trial."). Although there are exceptions to Rule 5A:18, appellants do not invoke them, and the Court will not apply the exceptions sua sponte. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc); *Jones v. Commonwealth*, 293 Va. 29, 39 n.5 (2017).

### B. The trial court was not plainly wrong in finding that appellants should have discovered the fraud by the exercise of due diligence.

"It is a general rule that whatever puts a party on inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty, and would lead to a knowledge of the facts by the exercise of ordinary intelligence and understanding." *Univ. of Richmond v. Stone*, 148 Va. 686, 693 (1927). Due diligence in the context of discovering fraud is "[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a

- 17 -

reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case." *Schmidt*, 276 Va. at 118 (alteration in original) (quoting *STB Mktg. Corp. v. Zolfaghari*, 240 Va. 140, 144 (1990)). "Whether such due diligence has been exercised must be ascertained by an examination of the facts and circumstances unique to each case." *STB Mktg.*, 240 Va. at 145.

Case law establishes that "one who accepts a written agreement or contract is presumed to know and assent to its contents. In addition, . . . one who [signs] a written contract . . . will normally be bound by its terms and [that] ignorance . . . of the terms will not ordinarily affect the liability of such person under the contract." *Mueller v. Commonwealth*, 15 Va. App. 649, 654 (1993) (alterations in original) (quoting *Simmons v. Peoples Bank*, 27 Bankr. 508, 510 (Bankr. W.D. Va. 1983)). In the investment context, a signed PPM can put an investor on notice inquiry of fraud when it alerts the investor "of the violations that he [later] charges." *Brumbaugh*, 985 F.2d at 162. "Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam." *Id.* Accordingly, the Fourth Circuit has explained that when a PPM "sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims and the limitations period begins to run from the date of sale on claims of fraud."[10] *Id.* at 163.

---

[10] In *Brumbaugh*, the Fourth Circuit articulated the following considerations that militate against delaying accrual in this context:

> There are three drawbacks to running a limitations period only after a plaintiff gains full knowledge of securities fraud. First, the plaintiff is discouraged from taking the actions necessary to bring the fraud to light. Second, the defendant loses the security of knowing when legal action against him has been foreclosed.
>
>    . . . .
>
> Third, the defendant is prejudiced in meeting the plaintiff's allegations. Memories fade, documents are lost, witnesses become

Here, there was a stark difference between the great, ominous clouds of the offering documents and the rosy forecast provided in the prior marketing materials. Perhaps the most salient difference relates to the GTA project's 2012 operating capability and pending orders for cars, as those factors directly correlate to the project's current health and long-term prospects. The marketing materials represented that the GTA project's "production of electric vehicles in 2012 has been completely sold out," and "multiple guarantees [had] been obtained for GTA's market success." Indeed, the project allegedly was operating on "order-based production" and had "received purchase orders for more than 40,000 electric vehicles," which would produce over $700 million in revenue.

The PPM contradicted that "ridiculously" false statement by informing appellants that the GTA project had no operating history and, other than the sale of 59 cars "by acquired company EuAuto," had "generated no revenue from [its] operations and remained in the product development stage." The project hoped to produce 5,000 cars in 2012, but that plan was subject to "significant risks." Indeed, the project had "limited experience" developing a production model or manufacturing an automobile, "no experience" in "high volume manufacturing," and did not know whether it would be able "to successfully mass market" its vehicles. In fact, the project had incurred "net losses" through 2011 and anticipated its losses "to increase significantly." Emphasizing the point, the PPM advised appellants that the project "assum[ed]" that it would "be able to secure the funding necessary" to build a production facility and that the purchased equipment could produce the intended vehicles.

---

unavailable. In sum, plaintiffs should not be able to coerce settlements simply because aging has improved an originally meritless claim—here by demonstrating the downside of a risky investment.

*Brumbaugh*, 985 F.2d at 162.

Next, the marketing materials informed appellants that the USCIS had approved 100% of Phase I and II investors' I-526 petitions. The PPM, however, cautioned that USCIS had denied ten prior GTA project investors' "I-526 applications." Moreover, although each investor needed to create 10 original, full-time jobs within the United States to gain USCIS's approval, when appellants signed the PPM, it advised that the GTA project had a total of only "71 full-time employees," despite 99 investors, and its future job creation could be substantially less than its target.[11]

Further, the marketing materials informed appellants Zeng and Chen that "EB-5 investments accounted for only 7.8% of total investment in the GTA [p]roject," with the rest coming from government sponsorship and low-interest loans. The marketing materials also informed the same appellants that all loans were "overcollateralized" with a "first priority lien" on real property and the Mississippi plant. But again, the PPM undermined those assertions, advising appellants that the GTA project sought $50 million in funding, and as of January 2012, 99 investors had contributed $49.5 million. Although the loan was secured by a deed of trust on 80 acres of land, including certain machinery, equipment, and fixtures, the deed of trust lacked certain "substantial covenants" for the protection of lenders, and the loan may not have been fully secured by the pledged collateral. The PPM reported that the GTA project might receive additional funding through "a joint venture based in China to manufacture and sell" vehicles. Such a "Joint Venture," however, was not guaranteed and had not been finalized. By contrast, the marketing materials represented that the project was already in such a joint venture with a reputable company.

---

[11] Although so few jobs would threaten the investors' immigration hopes, the marketing materials promised to appellants Zeng, Yang, and Rui Wang that USCIS would use a 17.45 "employment multiplier" when calculating direct and indirect jobs created. Nevertheless, the PPM provided a darker outlook, stating that the GTA project hoped to rely on an employment "multiplier" to determine direct and indirect job creations, but emphasizing that USCIS may not approve use of such a multiplier.

In sum, the marketing materials contained several representations that the GTA project was stable, with substantial expected income based on "order-based" production. It allegedly had a *perfect* record with USCIS approving investors' EB-5 applications, and that perfect record could be expected to continue given the employment magnifier applicable to both direct and indirect job creation. The investment was, according to the impression given by the marketing materials, low risk because of both the project's past and expected success, and the collateral available to refund the investments.

The PPM, however, should have disabused appellants of that illusion. It showed that the GTA project's record with USCIS was not perfect. It had no operating history outside of 59 cars, had "generated no revenue from [its] operations, and remained in the product development stage." It expected heavy losses, and its continued existence depended on future funding that might not materialize. Simply put, the "PPM contained a host of prior warnings making it plain that [appellants were] purchasing, to put it mildly, a highly speculative investment." *Brumbaugh*, 985 F.2d at 162. There was no guarantee of immigration success, or even that the investments would be repaid if the project failed.

Faced with that plethora of cautions, appellants could not simply wait to see if the "risks materialized before filing suit." *Id.* at 163. Rather, the PPM provided "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions" in the marketing materials. *Kennedy v. Josephthal & Co.*, 814 F. 2d 798, 802 (1st Cir. 1987) (quoting *Cook v. Aveien, Inc.*, 573 F.2d 685, 697 (1st Cir. 1978)). Thus, the PPM, described as a "big, flashing sign" that disclosed substantial risks of investing in the project, placed appellants on "inquiry notice" of their fraud claims. *See Brumbaugh*, 985 F.2d at 163 (holding "that when a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims and the limitations period begins to run from the date of sale on claims of fraud in that

prospectus"). Although appellants' understanding of English was limited, that cannot relieve them from acting under the PPM notice. "[O]ne who [signs] a written contract . . . will normally be bound by its terms" and "ignorance . . . of the terms will not ordinarily affect the liability of such person under the contract." *Mueller*, 15 Va. App. at 654.

Here, the trial court took evidence at the plea in bar hearing and made factual findings amply supported by the record. *See McDonnough v. Commonwealth*, 25 Va. App. 120, 127 (1997) ("Whether a party has used due diligence is a factual question that will be reversed on appeal only if it is plainly wrong or without evidence to support it.").[12] The trial court properly determined that appellants' claims accrued in 2012 and 2013. This renders their 2019 complaint time-barred.[13]

### C. Appellants did not prove that the statute of limitations was tolled, or that they would not have discovered the fraud in the exercise of due diligence.

"[S]tatutes of limitations are strictly enforced and must be applied unless the General Assembly has created an exception." *Birchwood-Manassas Assocs., LLC v. Birchwood at Oak Knoll Farm, LLC*, 290 Va. 5, 7 (2015) (quoting *Casey v. Merck & Co.*, 283 Va. 411, 416 (2012)).

---

[12] While the offering documents were signed in 2012 and 2013, appellants also learned negative news about the project in 2015 and 2016 yet failed to investigate or file suit until years later. For instance, in addition to the "flashing signs" in the offering documents, in 2015, appellant Chen learned that immigration applications were taking longer than normal, and in 2016, he also stopped receiving interest payments, yet he took no action to investigate, nor did he file suit. Relatedly, in 2016, when appellant Zeng stopped receiving interest payments, she asked for a refund, which was not provided, and then she took no further action to investigate. Zeng was also informed of bad news about the project's finances and ongoing litigation around it in this timeframe, yet she failed to file suit until July 2019.

[13] Appellants resist this conclusion by parsing the language of the marketing materials and PPM, arguing that there were no "direct contradictions." To begin, there are direct contradictions—the USCIS I-526 petition approval rate, for example. Regardless, appellants' argument inaccurately assumes there must be direct contradictions to put them on inquiry notice of fraud. Taken as a whole, the marketing materials and PPM in this case present diametrically opposed outlooks on the project's stability and viability, sufficient to put appellants on inquiry notice that the marketing materials were false and possibly fraudulently crafted. Importantly, given the posture of this case, we do not address whether appellants' reliance on the marketing materials was reasonable. Rather, we uphold the finding that the offering documents put appellants on inquiry notice under these facts.

"A plaintiff seeking to rely on th[e] tolling provision [in Code § 8.01-229] 'must establish that the defendant undertook an affirmative act designed or intended, directly or indirectly, to obstruct the plaintiff's right to file [the] action.'" *Mackey v. McDannald*, 298 Va. 645, 655 (2020) (quoting *Grimes v. Suzukawa*, 262 Va. 330, 332 (2001)). "An act that 'will relieve the bar of the statute must be of that character which involves moral turpitude, and must have the effect of debarring or deterring the plaintiff from his action.'" *Id.* (quoting *Newman v. Walker*, 270 Va. 291, 298 (2005)). "Mere silence by the person liable is not concealment, but there must be some affirmative act or representation designed to prevent, and which does prevent, the discovery of the cause of action." *Id.* at 656 (quoting *Culpeper Nat. Bank v. Tidewater Improvement Co.*, 119 Va. 73, 83-84 (1916)).

Appellants argue that their claims were tolled under Code § 8.01-229(D)(ii), which provides for tolling "[w]hen the filing of an action is obstructed by a defendant's . . . using any other direct or indirect means to obstruct the filing of an action." Appellants bore the burden of proving their entitlement to tolling of the statute of limitations. *Birchwood-Manassas*, 290 Va. at 7. Moreover, whether the evidence proves that a defendant "used 'direct or indirect means to obstruct the filing of an action' is a question for the trier of fact, who is 'present in the courtroom to observe witnesses' demeanor and hear their testimony as they undergo rigorous cross-examination.'" *Mackey*, 298 Va. at 658 (first quoting Code § 8.01-229(D)(ii); and then quoting *Dennis v. Commonwealth*, 297 Va. 104, 126 (2019)).

Here, the trial court did not err by holding that appellants' claims were not tolled. On appeal, appellants argue that the interest payments and frequent communications with them following their investments justified tolling the statute of limitations because those actions "were *designed* to prevent" them from suspecting fraud. They insist that the payments and communication arose from Wang's "fraudulent intent."

The "difficulty of establishing 'actual intent,' evidence of fraud" is notorious. *Fox Rest Associates, L.P. v. Little*, 282 Va. 277, 284 (2011) (quoting *In re: Porter*, 37 B.R. 56, 63 (Bankr. E.D. Va. 1984)). Here, the payment of interest owed, and communications about the GTA project's undertakings, are as consistent with the project attempting to fulfill its contractual obligations with investors as with fraud.[14] Appellants point to no evidence justifying the leap that those circumstances necessarily arose from Wang's subjective intent to actively obstruct them from filing suit. Indeed, no evidence demonstrates that Wang prevented appellants from reading the offering documents, retaining counsel, or even reviewing the GTA project's financial records.

Appellants next argue that the statute of limitations does not extinguish the claim because "there [was] no evidence that additional diligence would have uncovered evidence of fraud." They insist that Wang had to prove that due diligence "would have necessarily led to a discovery of the facts from which the law imputes fraud." That argument, however, erroneously calls for Wang to meet a burden of evidence that is properly borne by appellants. A defendant asserting the plea in bar to a fraud claim bears the burden of proving that the statute of limitations has run, including when the cause of action accrued. *Schmidt*, 276 Va. at 117. After the defendant sustains his burden, however, the burden shifts to the plaintiff "to prove that, despite the exercise of due diligence, he could not have discovered the alleged fraud within the two-year period before he commenced the action." *Id.*; *Hughes*, 203 Va. at 907. Accordingly, to the extent that there is a lack of evidence on whether due diligence would have led to the discovery of the fraud, that circumstance weighs against appellants.

---

[14] In any event, the interest payments stopped in 2016—well before the 2019 action was filed.

In addition, the record simply contains no evidence that any plaintiff conducted due diligence, or that there was some obstacle that would have prevented appellants from discovering that the marketing materials contained false representations. Many of the false statements would have been obvious had appellants read or translated the PPM, and nothing prevented appellants from doing so. For example, appellants presented no evidence that the GTA project's financial records, which they were permitted to access and review, would not have revealed the true state of the project. The trial court found that the appellants "failed to exercise even the simplest of diligence . . . ." The record overwhelmingly supports that conclusion. Accordingly, the trial court did not err by applying the statute of limitations, nor in refusing to toll its commencement.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*